Kendall A. MIX, Plaintiff,

v.

E.F. HUTTON & CO., INC., et al., Defendants.

Kendall A. MIX, II, Plaintiff,

v.

E.F. HUTTON & CO., INC., et al., Defendants.

Phoebe A. MIX, Plaintiff,

v.

E.F. HUTTON & CO., INC., et al., Defendants.

Civ. A. Nos. 85–3108, 85–3109 & 85–3110.

United States District Court, District of Columbia.

Sept. 5, 1989.

Francis W. Fraser, Ragan & Mason, Washington, D.C., Edward J. Callahan, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for plaintiff.

F. Joseph Warin, Ronald R. Massumi, Kutak, Rock & Campbell, Washington, D.C., for defendants.

MEMORANDUM OPINION
AND ORDER

THOMAS F. HOGAN, District Judge.

This case is presently before the Court on defendants' Motion to Strike Plaintiffs' Claim under Section 12(2) of the 1933 Act. The motion has been fully briefed and argued, and the Court had previously taken it under advisement. Defendants, with the Court's leave, on August 18, 1989, filed a

supplemental brief advising the Court of additional recent case law supporting their motion. However, on August 28, 1989, in response to the defendants' supplemental authority, plaintiffs noticed their intent to "withdraw Count IV of their complaints which alleges that Defendants violated Section 12(2) of the 1933 Act," suggesting that "[t]he complaints can be amended, if necessary, following trial."

The Court shall construe plaintiffs' surprise notice as a motion to amend the complaints or for partial voluntary dismissal, which in either case requires Court approval. *See* Fed.R.Civ.P. 15(a), 41(a)(2). For the reasons set forth below—the same reasons the Court would have granted defendants' motion to strike—the Court shall permit plaintiffs to withdraw their Section 12(2) claims voluntarily in the face of defendants' motion. *Cf.* Fed.R.Civ.P. 41(a)(2) (non-stipulated voluntary dismissal subject to "such terms and conditions as the court deems proper").

The gravamen of plaintiffs' complaints in this case is that defendants, as plaintiffs' broker, engaged in excessive, unsuitable, and unauthorized trading in stock index options, causing plaintiffs to lose money. One of plaintiffs' original claims is that defendants thereby violated Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (1982).[1] Second Amended Complaints at Count IV. The question now presented is whether Section 12(2) covers such stock index option transactions. Specifically, defendants contend that "because Section 12(2) applies only to the purchase of securities initially offered via a prospectus or

registration statement ..., [it] is not applicable to securities, such as the index options in the cases at bar, which are traded in the secondary market without the use of a prospectus." Defendants' Memorandum at 1.

The Court has previously held that defendants qualify as "sellers" for purposes of Section 12(2), and the Court reaffirms that holding. *Mix v. E.F. Hutton & Co., Inc.*, Nos. 85–3108, 85–3109, 85–3110 (D.D.C. Aug. 30, 1988). The Court's holding was based on the United States Supreme Court's reasoning in *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), concerning the meaning of "seller" for purposes of Section 12(1). The weight of post-*Pinter* authority is in accord with this Court's holding. *See, e.g., Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir.1988); *Abell v. Potomac Insurance Co.*, 858 F.2d 1104, 1113–15 (5th Cir.1988). Contrary to plaintiffs' arguments, however, this Court's holding and the *Pinter* Court's reasoning on the "seller" issue are not dispositive of the present issue, which is whether stock index option trading involves the type of security or the type of transaction covered by Section 12(2).

█ There is no question that standardized options, including stock index options, qualify as "securities" for purposes of the 1933 Act. To make this perfectly clear, in 1982 Congress amended the definition of "security" in the 1933 Act to include "any put call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value

---

1. Section 12, in its entirety, provides as follows: Any person who—
   (1) offers or sells a security in violation of section 5 [15 U.S.C. § 77e, prohibiting the sale of unregistered securities], or
   (2) offers or sells a security (whether or not exempted by the provisions of section 3 [15 U.S.C. § 77c], other than paragraph (2) of subsection (a) thereof) by the use of any means or instruments of transportation or communication in interstate commerce or the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances

under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
15 U.S.C. § 77*l*.

thereof)...." Pub.L. No. 97–303, § 1, 96 Stat. 1409, 1409 (1982) (codified at 15 U.S.C. § 77b(1)). *See generally House Comm. on Energy and Commerce, Clarifying the Jurisdiction of the Securities and Exchange Commission and the Definition of Security,* H.Rep. No. 626, 97th Cong., 2d Sess. (1982), U.S.Code Cong. & Admin.News 1982, p. 2780. The obvious purpose of this amendment was to "make clear that such instruments are themselves separate securities," with the goal that "when traded on a national securities exchange and issued by a registered clearing association, all options will be subject to registration and prospectus delivery requirements comparable to those applicable to exchange-trade options on equity securities." *Id.* at 12, U.S.Code Cong. & Admin. News 1982, p. 2790.

The Court must therefore reject defendants' suggestion that index options trading is categorically divorced from the 1933 Act. Indeed, in accordance with Congress's intent, the SEC has promulgated regulations governing the registration and sale of standardized options, pursuant to the 1933 Act. *See* 47 Fed.Reg. 41,950 (1982). This regulatory scheme includes the optional filing of a registration statement and the provision of a prospectus at an investor's request. *See id.* at 41,951; 17 C.F.R. § 239.20 (Form S–20 for Standardized Options). Recognizing the "unique nature of standardized options," however, the SEC established a new "options disclosure document" designed to be the main disclosure vehicle to investors of the nature and risks of options trading. *Id.,* 47 Fed.Reg. at 41,951, 41,952–53; 17 C.F.R. § 240.9b–1. Broker-dealers are required to furnish an options disclosure document to their customers before trading in options on their accounts. 17 C.F.R. at § 240.9b–1(d).[2]

■ The record indicates defendants furnished plaintiffs with the required disclo-

sure documents. *See* Defendants' Reply Memoranda in Support of Motions for Summary Judgment, No. 85–3108, at 36; No. 85–3109 at 24; and No. 85–3110 at 28 (Feb. 26, 1987) ("Characteristics and Risks of Standardized Options"). Plaintiffs' Section 12(2) claims, however, are not premised on any misrepresentations or omissions in such disclosure documents or in any registration statement, prospectus, or other communication made in connection with the "initial distribution" of the index options. Moreover, it is precisely the lack of any such allegations that defendants contend is fatal to plaintiffs' Section 12(2) claims.

Defendants' argument is based on the growing body of federal district court decisions, primarily in the Southern District of New York, holding that Section 12(2), and the 1933 Act in general, do not cover post-distribution trading of securities or trading in "secondary" markets. *See McCowan v. Dean Witter Reynolds, Inc.,* [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,423 at 92,726–727, 1989 WL 38354 (S.D.N.Y. Apr. 11, 1989); *Strong v. Paine Webber, Inc.,* 700 F.Supp. 4, 5 (S.D.N.Y.1988); *SSH Co., Ltd. v. Shearson Lehman Bros., Inc.,* 678 F.Supp. 1055, 1059 (S.D.N.Y.1987); *Ackerman v. Clinical Data, Inc.,* [1985–86 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,207 at 91,568 n. 3, 1985 WL 1884 (S.D. N.Y. July 8, 1985); *Klein v. Computer Devices, Inc.,* 591 F.Supp. 270, 277–78 (S.D. N.Y.1984); *Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080, 1095 (S.D.N.Y. 1977), *aff'd mem.,* 636 F.2d 1201 (2d Cir. 1980); *Bresson v. Thomson McKinnon Securities, Inc.,* 641 F.Supp. 338, 342 (S.D.N. Y.1986); *Panek v. Bogucz,* 718 F.Supp. 1228 (D.N.J.1989) (available on Lexis); *Cheltenham Bank v. Drexel Burnham Lambert, Inc.,* [Current Binder] Fed.Sec.L. Rep. (CCH) ¶ 94,391 at 92,542, 1989 WL 80279 (E.D.N.C. Mar. 15, 1989); *Leonard v. Shearson Lehman/American Express,*

---

**2.** Interestingly, in response to concerns raised by the Options Clearing Corporation and others that "the disclosure document could be deemed to be a prospectus so as to subject the preparers to the liability of provisions of Section 12 of the Securities Act," 47 Fed.Reg. at 41954, the regulations provide that the options disclosure material is not deemed a prospectus as long as it does not go beyond defined limits. *Id.;* 17 C.F.R. § 230.134a; *see also* 49 Fed.Reg. 12687 (1984) (amending Rule 134a to allow limited advertising of options products, including identification of securities comprising an index).

*Inc.*, 687 F.Supp. 177, 179–80 (E.D.Pa. 1988); *First Union Brokerage v. Milos*, 717 F.Supp. 1519 (S.D. Fla.1989) (available on Westlaw, Lexis); *Ralph v. Prudential–Bache Securities, Inc.*, 692 F.Supp. 1322, 1325 (S.D. Fla.1988).[3]

The principal rationale of these decisions is that the 1933 Act was designed to govern the distribution of securities and that post-distribution trading is governed by the later Securities and Exchange Act of 1934. Judge Leval's reasoning in *SSH*, one of the seminal cases from the Southern District, is representative:

> Plaintiff has not made out a claim under § 12(2) of the '33 Act because that section imposes liability only on a 'person who ... offers or sells a security ... by means of a *prospectus or oral communication.*' The phrase 'prospectus or oral communication' refers to a prospectus, registration statement, or other communication related to batch offering of securities, not to subsequent trading.... The purpose of the '33 Act was the regulation of the *distribution* of securities. Post-distribution trading is regulated by the '34 Act.

678 F.Supp. at 1059 (citations omitted, emphasis in original).

As subsequent courts have noted, the issue may boil down to the meaning of the words "or oral communications" in Section 12(2), since the term "prospectus" obviously appears to refer to initial distribution. *See Elysian*, 713 F.Supp. at 750 n. 17 ("The question here concerns the meaning of the words 'or oral communication.' If ... this reference were more closely linked to the word prospectus (as in 'or *related* communication') defendants' argument would be more compelling. If Congress intended to so narrowly limit the application of Section 12(2), more narrow words were available to do so." (emphasis in original)). While the term "prospectus" is defined in the 1933

Act, *see* 15 U.S.C. § 77b(10)—effectively including certain oral communications by radio and (after a 1954 amendment) television—the term "oral communication" is nowhere defined. Moreover, the Court finds that the term as used in Section 12(2) is ambiguous and that resort to the legislative history is therefore appropriate in determining Congress's intent.

Along with the majority of other federal district courts to consider the issue, this Court finds the legislative history of the 1933 Act relatively clear on this point. The key House committee report states generally that the Act was designed to "affect[ ] only new offerings of securities.... [and] does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristics of a new offering...." H.R.Rep. No. 85, 73d Cong., 1st Sess. 5 (1933). Most significantly, on the civil liabilities created by Sections 11 and 12, the "committee emphasize[d] that these liabilities attach only where there has been an untrue statement of material fact or an omission to state a material fact in the registration statement or the prospectus— the basic information by which the public is solicited." *Id.* at 9.

The legislative history of Section 17 of the Act, 15 U.S.C. § 77q, also bears on the interpretation of Section 12(2). That is, Section 12(2) has been called "a civil liability analogue to § 17." 1 L. Loss & J. Seligman, *Securities Regulation* 384 (3d ed. 1989). Indeed, defendants here accuse plaintiffs of "attempting to bring a Section 17(a) action by means of Section 12(2) although this Court has already dismissed their Section 17(a) claim...." Defendants' Reply at 7–8. The Court agrees with defendants that Section 17(a), unlike its civil counterpart in Section 12(2), was intended as a "major departure" from the remainder of the 1933 Act's concern with initial distribution.

---

**3.** *But see Wilko v. Swan,* 127 F.Supp. 55, 58–60 (S.D.N.Y.1955); *Scotch v. Moseley, Hallgarten, Estabrook & Weeden, Inc.,* 709 F.Supp. 95, 97–98 (M.D.Pa.1988); *Ballay v. Legg Mason Wood Walker, Inc.,* No. 88–6867, 1988 WL 137464 (E.D.Pa. Dec. 21, 1988) (available on Westlaw, Lexis); *Elysian Federal Savings Bank v. First*

*Interregional Equity Corp.,* 713 F.Supp. 737, 747–51 (D.N.J.1989). As the above citations indicate, there is a conflict between the districts and even between judges within the same district. Some guidance from the Courts of Appeals would thus be helpful.

When the converse of the issue was presented—*i.e.*, whether Section 17(a) was limited to initial distribution—the United States Supreme Court rejected the argument, reasoning that

> [a]lthough it is true that the 1933 Act was primarily concerned with the regulation of new offerings, respondent's argument fails because the antifraud prohibition of § 17(a) was meant as a major departure from that limitation. Unlike much of the rest of the Act, it was intended to cover any fraudulent scheme in any offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading.

*United States v. Naftalin*, 441 U.S. 768, 777–78, 99 S.Ct. 2077, 2084, 60 L.Ed.2d 624 (1979). The legislative history of Section 17 supports this reasoning. Section 17 was added from the Senate bill, and the key Senate report explains that the

> act subjects the sale of old or outstanding securities to the same *criminal* penalties and injunctive authority for fraud, deception, or misrepresentation as in the case of new issues put out after the approval of the act. In other words, fraud or deception in the sale of securities may be prosecuted regardless of whether the security is old or new, or whether or not it is of the class of securities exempted....

S.Rep. No. 47, 73d Cong., 1st Sess. 4 (1933) (emphasis added), *quoted in Naftalin*, 441 U.S. at 778, 99 S.Ct. at 2084.

In contrast, there is no corresponding statement conferring such a broad scope on the civil liabilities of Section 12 anywhere in the legislative history. The Court, therefore, rejects the reasoning of those courts that have cited *Naftalin* and Section 17(a) as supporting an equally expansive interpretation of Section 12(2). *See Scotch,* 709 F.Supp. at 98 & n. 3; *Ballay. Compare Ralph,* 692 F.Supp. at 1325 ("The rationale of *United States v. Naftalin* ... regarding Section 17(a) of the Securities Act of 1933 will not be extended to this case concerning Section 12(2)....").

In sum, the Court holds that Section 12(2) is limited to the initial distribution of securities and does not encompass post-distribution trading. The Court has previously deferred to the "remedial purposes" of the Act in construing the term "seller" broadly under Section 12(2). Absent a clear congressional mandate, however, the Court is not convinced that the remedial purposes of the 1933 Act alone justify the boundless construction urged of Section 12(2) as covering post-distribution transactions.

Because plaintiffs have not alleged that they purchased the stock index options as part of an "initial distribution," their Section 12(2) claims are subject to dismissal. Furthermore, given their *sui generis* nature, it is at least conceptually awkward to speak of the "initial distribution" of standardized options for purposes of Section 12(2). That options trading is only awkwardly accommodated, if at all, under Section 12(2) is confirmed by defendants' remaining alternative argument that, to the extent plaintiffs "wrote" (*i.e.*, "sold") options, they do not have standing as "purchasers" of securities for purposes of Section 12(2). *See Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 1194, 1196 (6th Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982) ("It is clear that an option writer sells the right to purchase [or sell] securities and is not purchasing anything."); *Prudential–Bache Securities, Inc. v. Cullather*, 678 F.Supp. 601, 605–06 (E.D. Va. 1987) ("Section 12(2) does not apply to options contracts because an option writer is a seller, not a purchaser."); *Petralia v. Donaldson, Lufkin & Jenrette Securities Corp.*, [1981–1982 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,353 at 92,190–91, 1981 WL 1703 (N.D. Cal. Sept. 15, 1981); *Panek,* 718 F.Supp. at 1231 ("Under section 12(2), a seller of options ... is not a purchaser.").

Options trading frequently involves both sales and purchases of options as opening transactions with corresponding "cover" transactions. *See generally* Poser, *Options Account Fraud: Securities Churning in a New Context,* 39 Bus. Law. 570, 587 ("The purchase or sale transaction

which results in a person becoming a buyer or a writer is called an 'opening transaction.' A buyer can liquidate his position in an option prior to its expiration by making an offsetting sale of the identical option, while a writer can liquidate his position prior to the expiration by making an offsetting purchase of the identical option."). Both types of opening transactions were involved in this case, and plaintiffs admit that "[a]pplication of defendants' theory requires the segregation of the hundreds of index options trades at issue into two categories to distinguish instances in which plaintiffs should be characterized as purchasers from those in which they should be characterized as sellers." Plaintiffs' Opposition at 18. Plaintiffs, however, nowhere rebut the force of defendants' "theory," and the cases supporting it, which are based on the clear requirement of Section 12(2) that a plaintiff be a "purchaser" of securities.

Accordingly, it is this 1st day of September, 1989,

ORDERED that plaintiffs' claims under Section 12(2) of the 1933 Act shall be DISMISSED.